UNITED STATES DISCRTIC COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

John Franklin

       Plaintiff,

v.

Joshua Bryce Newman,

       Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**JURY TRIAL DEMANDED**

**COMPLAINT**

12-CV-_____
ECF Case

      Plaintiff John Franklin, by his undersigned attorneys, Creizman PLLC, for his complaint against Joshua Bryce Newman, alleges as follows:

## NATURE OF ACTION

      Franklin is a victim of a fraudulent scheme perpetrated by Newman in which Newman misappropriated over $400,000 from their joint business venture, Northstar, Inc. to cover personal debts and expenses.  Franklin seeks compensatory and punitive damages arising from the fraud.  Newman also has fraudulently used, and, on information and belief, continues to use Franklin's name and businesses without Franklin's authorization in soliciting investments for several of Newman's purported businesses.  Franklin therefore also seeks injunctive relief prohibiting Newman from continuing to use Franklin's name and businesses to effectuate other fraudulent schemes.

## PARTIES

      1.      Plaintiff resides in New Jersey.  He operates two exercise facilities affiliated with the CrossFit company.  CrossFit promotes a high intensity strength and conditioning program that over the last five years has become one of the most popular fitness disciplines in the country.

Plaintiff's exercise facilities, known in the lingo of CrossFit enthusiasts as "boxes," are Hudson River CrossFit, located in Hoboken, New Jersey, and Bowery CrossFit, located in Manhattan.

2. Defendant resides in New York City and holds himself out as Managing Partner of Outlier Capital, a venture capital firm, which "invests in and helps build smart companies disrupting stagnant industries." *See* http://www.joshuanewman.com/josh/. Until July 2014, Defendant was a co-owner and executive officer of CrossFit NYC, the largest and oldest CrossFit box in New York City. On May 21, 2015, Defendant was arrested and charged in the United States District Court for the District of New Jersey with masterminding a scheme in which he misappropriated money that he raised from investors under fraudulent pretenses. The case is pending before the Honorable Steven C. Mannion and is captioned *United States v. Joshua Bryce Newman*, 15-MJ-6127 (SCM).

**JURISDICTION AND VENUE**

3. Pursuant to 28 U.S.C. Section 1332, this Court has subject matter jurisdiction as the parties are citizens of different states and the amount in controversy exceeds the sum of $75,000.

4. Venue is proper pursuant to 28 U.S.C. Section 1391(b)(1) and (2) because Defendant Newman resides in Manhattan and a substantial part of the events and omissions giving rise to this claim occurred in Manhattan.

**FACTS**

5. Newman was well known in the CrossFit community because of his success in co-founding CrossFit NYC, one of the most successful independently-owned CrossFit facilities in the country.

6. In early 2014, Franklin, who had then just started his own CrossFit facility, reached out to Newman, whom he had read about and admired. In an email, he asked Newman for his advice on how to succeed in the CrossFit business. Newman ended up meeting with Franklin and the two became friendly. Franklin proved to be a masterful facility operator, with his first facility achieving considerable success and generating sufficient revenues for him to open a second facility. Franklin viewed Newman as a mentor, and the two kept in touch.

7. In or about April of 2014, Newman solicited Franklin to invest in the National Pro Grid League, a professional athletic league consisting of co-ed teams that compete against each other in a series of races that involve an array of fitness challenges. Franklin declined the "opportunity," choosing instead to focus on his existing CrossFit businesses. On information and belief, Newman was never affiliated with the National Pro Grid League and was not in a position to solicit investments in that business.[1]

8. In or about July of 2014, Newman told Franklin that he was leaving CrossFit NYC to start a new company, Northstar, that he envisioned build and operate a network of CrossFit facilities across the country, beginning with the New York metropolitan area. Newman assured Franklin that although he was no longer working with CrossFit NYC, the separation was amicable and there was no litigation against him. He also told Franklin that he still owned shares of CrossFit NYC.

---

[1] A *New York Times* article released April 16, 2015, quoted the chief executive of the National Pro Grid League, James Kean, as saying that Newman was "not affiliated' with the league in any way. Moreover, the story noted that a lawyer for the league sent a cease and desist notice to Newman telling him to stop telling prospective investors that he was affiliated with the league. *See A Yale Graduate Leaves a Trail of Ventures and Debt*, available at http://www.nytimes.com/2015/04/17/business/dealbook/a-yale-graduate-leaves-a-trail-of-ventures-and-debts.html.

9. In late October of 2014, Newman formally offered Franklin the opportunity to become a "co-founder" and partner in Northstar. Newman proposed that he would own 70% of Northstar and Franklin would own 30%. Newman represented that Northstar's anticipated revenues would "put us on par with a hot tech company raising an A round," and predicted that Franklin would "pocket" $20-$25 million from the business.

10. Newman told Franklin that Northstar was generating substantial interest from investors and that he had "soft-circle commitments from investors that will close a $5m round before the end of the month." Franklin considered the offer carefully and persuaded Newman to participate with him in creating a partnership charter, a structured process for prospective business partners to shape their own agreements regarding all aspects of their relationship. Although Newman agreed to participate in the partnership charter process, he persuaded Franklin that they could not wait until the process was completed to get the company up and running.

11. Newman outlined for Franklin their principal roles in the company: Newman would handle the "money" aspects of the business, including preparing the marketing materials, courting investors, finding spaces for new facilities, and negotiating leases. Franklin's responsibilities would focus on the facility management issues, including hiring staff, and locating gym equipment, and overseeing human resources, matters in which Franklin had expertise due to his ownership of two other gyms.

12. By November 2014, Newman and Franklin were working full-time on building the business.

**Newman's Misrepresentations Concerning Investments In Northstar**

13. Newman frequently informed Franklin that his fund-raising efforts were proving to be very successful and that investor "dollars" were coming in quickly.

14.     On or about November 19, 2014, Newman emailed Franklin the marketing presentation materials for prospective investors, which outlined the investing opportunities in NorthStar.

15.     The marketing materials represented that Northstar would be closing the initial round of funding very quickly "due to high interest and serious time pressure." The materials also told prospective investors that "[t]hus far, **we have 50% of the round** committed from prior investors. We're raising the remaining 2.5m, with a rolling close, as we're actively deploying dollars at the upcoming 150 e 42nd St location. Get in!"

16.     Believing the statements in the deck to be true, Franklin emailed the marketing materials to several interested members of his gyms.

17.     On or about December 18, 2014, Newman, along with Franklin, opened a bank account for Northstar at Bank of America (the "Bank of America Account").

18.     As the partner in charge of financing, Newman controlled the Bank of America Account, including online access to the account.

19.     Newman told Franklin that now that they had opened the Bank of America Account, the investor money that had already been committed would begin "rolling in."

20.     Newman subsequently assured Franklin that investor funds were flowing into the account, and at one point, represented that approximately $1.3 million from investors had been deposited in the Bank of America Account.

21.     In January, one of the people to whom Franklin had sent the marketing materials decided to invest $50,000 ("Investor A") in Northstar, which was deposited into the Bank of America Account.

5

22.     Later in January, Newman told Franklin that he was dissatisfied with Bank of America's service, and recommended that they close the Bank of America Account and open a new account for Northstar at JPMorgan Chase ("the Chase Account").  Because Newman was principally dealing with the account, Franklin took him at his word and agreed.  Unbeknownst to Franklin, Newman did not close the Bank of America Account, but, instead, kept it open, and changed the address for the account to his home so that only Newman would see those statements.  After "closing" the Bank of America Account, the Chase Account was the only Northstar bank account to which Franklin maintained joint access with Newman.

23.     Newman told Franklin that before he would close the Bank of America Account, he would transfer the purported investor funds from the Bank of America Account to the Chase Account.  Yet as time passed and no funds appeared in the Chase Account, Franklin and others asked Newman where the money was, and Newman offered various excuses as to why the funds had not yet reached the Chase Account.

**Newman Persuades Franklin To Give Him Money Under False Pretenses**

24.     Among the facilities Newman and Franklin were considering acquiring for Northstar was a rental space located near Grand Central Station.

25.     On or about December 22, 2014, Newman contacted Franklin and advised him that he would be able to secure a favorable lease on the Grand Central property, but required the funds immediately to forward to the landlord.  Newman proposed that he and Franklin each provide $55,000 in personal funds to secure the deal.

26.     Franklin asked Newman why they needed to front their own personal funds for the lease when Newman had previously told him that they had already raised millions of dollars in investor funds for Northstar.  Newman told Franklin that the investor money that had been

6

raised for Northstar had not yet "cleared" into the Bank of America Account, but that it would be arriving very soon, at which point Newman would immediately pay Franklin back.

27. Newman directed Franklin to wire the $55,000 to an account at Santander Bank ("the Santander Account"). At the time, Franklin believed he was wiring the money into Newman's personal account, but, in fact, Newman had opened the Santander Account in Northstar's name, without telling Franklin or obtaining his consent.

### Franklin Spends Money On A Corporate Retreat Based On Newman's Misrepresentations

28. In January 2015, Franklin paid for a staff retreat for future Northstar employees. He flew about ten future staff members to Florida for several days, spending approximately $10,000 of his own money. Newman attended the retreat. Franklin spent this money having believed Newman's representations that millions of dollars of investor funds had already been raised for Northstar, and that a substantial portion of those funds were already deposited in Northstar bank accounts.

### Newman Causes Franklin To Induce Others To Invest In Northstar Based On Newman's Lies

29. During the second week of February 2015, two additional investors whom Franklin had sent the marketing materials expressed interest in investing in Northstar ("Investors B and C").

30. Newman and Franklin met with Investors B and C, and at the meeting, Newman represented that he had raised approximately $3.5 million of their goal of $5 million.

31. Investors B and C agreed to invest $250,000 in the project, and on February 12, 2014, their money was deposited into The Chase Account.

7

**Franklin Sends A Wire Transfer Of His Own Funds
Based On Newman's Misrepresentations**

32.     On or about February 10, 2015, Newman informed Franklin that he had successfully negotiated a lease for a gym space for Northstar in Hoboken, for which he had to deposit $84,000.  Newman said that he had attempted to wire the $84,000 himself, but the wire did not go through because the funds were erroneously held by the bank due to internal fraud controls.

33.     Believing that Northstar was in danger of losing the real estate opportunity, and because Newman told Franklin that it would be "better to overfund, rather than underfund here," Franklin initiated a wire of $84,000 in personal funds to the landlord in order to secure the Hoboken lease.  Newman told Franklin that he would reimburse Franklin once the funds became available to him and were no longer tied up "in the fraud system."

**Franklin Investigates Newman's Representations**

34.     On or about February 27, 2015, Franklin received a wire alert from the Chase Account stating that Newman had transferred $60,000 from the Chase Account to an individual Franklin did not know.  Franklin confronted Newman about the transfer, and Newman explained that he needed the $60,000 to purchase "intellectual property rights" from his last CrossFit venture, CrossFit NYC.

35.     At this point, Franklin became very suspicious and immediately began to investigate.  Franklin visited the Bank of America branch, and asked if the Bank of America Account had been closed, as Newman previously had represented.  Franklin learned that the Bank of America Account had not been closed, and that Newman had simply changed the address on the Bank of America Account so that the statements would be sent directly to Newman's home address.

36. Because Franklin was still a signatory on the account, he asked for, and obtained previous months' statements from the Bank of America Account. Those statements reflected that Newman had used the account to make numerous personal expenditures including groceries, drug store purchases, and pet supplies. The statements also revealed that no investor money was ever deposited into the Bank of America Account.

37. Franklin confronted Newman about his discovery, and Newman admitted that he had gotten himself into "deep trouble" and was desperate to pay off "some old investors." Newman said that he needed to pay off these old investors so that they could start fresh with Northstar. Newman also stated once again that he needed to buy back his CrossFit NYC "intellectual property rights."

38. On March 19, 2015, Franklin sent Newman a resignation letter resigning from his position at Northstar and any other Northstar entities.

39. On March 24, 2015, Franklin sent a cease and desist letter to Newman, demanding that he immediately stop using his name or his businesses on Newman's website or in any negotiations.

40. Out of a sense of moral obligation, Franklin obtained a $300,000 loan from his parents and paid back Investors A, B, and C in full.

41. To date, Newman has not repaid Franklin, or Investors A, B and C for the investments they made based on his misrepresentations.

42. After resigning from Northstar, Franklin discovered that the $55,000 that Franklin wired into the Santander Account at Newman's direction for the purported Grand Central facility was, in fact, immediately transferred into a personal bank account held by Newman. The bank records reflect that Newman used those funds to offset debts to previous investors in his prior

9

failed business ventures, and to pay for personal expenses like groceries, taxis, take-out food, and a gym membership.

43. Newman is still using the Northstar name on his website, and, upon information and belief, he is still using Franklin's name and biography to fundraise.

44. Franklin therefore seeks that the Court enter an order enjoining Newman from using Franklin's name and businesses with which Franklin is affiliated in any marketing materials used to solicit investments for any businesses Newman claims to be associated with.

45. Additionally, Franklin seeks compensatory damages for a total amount of $449,000, plus pre-judgment and post-judgment interest, punitive damages, the fees and costs of this lawsuit, and any other relief the Court deems to be appropriate and just.

## COUNT ONE
## Fraud

46. Franklin realleges each and every prior allegation herein.

47. Newman willfully made material misrepresentations of fact to Franklin, which he knew to be false, in order to induce Franklin to give him money, and to induce others to give him money.

48. Specifically, Newman falsely represented that he had already raised millions of dollars for Northstar, when he knew no such funds were raised.

49. Newman also falsely represented that he was in no legal dispute with CrossFit NYC, and claimed that he stepped down from that company of his own volition.

50. Newman also falsely represented that he needed funds to secure the lease at Grand Central for a new Northstar gym.

51. Newman knew these representations and others were false when he made them to Franklin.

52. Franklin justifiably relied on Newman's representations and invested, and lost, personal funds as a result of those fraudulent misrepresentations.

53. Franklin has been injured in the amount of $449,000 as a result of Newman's fraud.

## COUNT TWO
### Conversion

32. Franklin repeats and realleges each and every prior allegation herein.

33. Newman intended to take control of the monies Franklin wired to him and of the investor monies Franklin caused to be invested in Northstar.

34. He took those monies and used them not for the purpose he represented, but rather to pay back old debts and for personal use.

35. Newman has not paid back one dollar to date.

38. As a result of Newman's conversion, Franklin has lost over $400,000.

## COUNT THREE
### Breach of Fiduciary Duty

39  Franklin repeats and realleges each and every prior allegation herein.

40. Newman and Franklin made an agreement to be partners in the development of Northstar, and as such, a fiduciary relationship existed between them.

41. Newman breached his duty by acting in bad faith, by knowingly lying to Franklin, and by stealing Franklin's money for his own personal use.

42. As a result of Newman's misconduct, Franklin has suffered damages of $449,000.

WHEREFORE, Plaintiff prays for an entry of judgment against Defendant that:

1. Awards compensatory and punitive damages according to proof.

2. Imposes injunctive relief requiring Defendant and any partners, agents, employees, representatives, assignees, and all persons acting in concert or participation with him, to refrain from using Plaintiff's name or businesses to soliciting investments, or in connection with *any* of Defendant's personal or professional activities.

3. Awards reasonable attorneys' fees and costs of this action; and

4. Awards all such other relief as the Court deems just and proper.

## JURY DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: New York, New York
June 22, 2015

Respectfully submitted,

**CREIZMAN LLC**

By: *Eric M. Creizman*
Eric M. Creizman
Caroline J. Polisi
565 Fifth Avenue, 7th Floor
New York, New York 10017
Telephone: (212) 972-0200
Facsimile: (646) 200-5022
Email: ecreiz@creizmanllc.com
cpolisi@creizmanllc.com